UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ALAM SHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 04-182-B-W |
| UNITED STATES DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR JUDGMENT**

This case presents an employment discrimination claim and a petition for review of a final order of the Merit System Protection Board (MSPB) that sustained adverse employment measures imposed on the plaintiff-petitioner, Alam Sher, by his employer, the defendant United States Department of Veterans Affairs (VA). Sher asserts that the VA imposed the adverse action on him because of discriminatory animus it harbored toward him based on his Pakistani national origin and his Muslim faith. In addition, Sher challenges the administrative determination of the MSPB based on alleged due process violations. Now before the court is the VA's motion for judgment on the administrative record. (Docket No. 9.) Also before the court is an amended motion by Alam Sher to supplement the administrative record with a certain training videotape (Docket No. 21) and a corresponding motion by the VA to strike the videotape (Docket No. 23). In a companion Memorandum of Decision, I deny the motion to supplement and grant the motion to strike. Based on the discussion that follows, I recommend herein that the Court grant the VA's case dispositive motion for judgment.

Also pending is Sher's Motion for Oral Argument/Hearing (Docket No. 34). I have issued recommended decisions and orders on the various motions that Sher seeks hearing upon and if appeals or objections are filed on my recommended decisions or orders, the motion for oral argument/hearing can be addressed in the context of those objections/appeals.

## JURISDICTION AND STANDARDS OF REVIEW

This dispute falls under the aegis of the Civil Service Reform Act (CSRA). That Act provides for review by the Merit Systems Protection Board (MSPB) of most personnel actions taken by a federal agency against an "employee." See, e.g., 5 U.S.C. §§ 7551 (defining employee), 7513 (concerning "cause and procedure" for adverse employment actions), 7701 (concerning "appellate procedures"). The CSRA also affords employees aggrieved by an adverse employment action a right to seek judicial review of decisions of the MSPB. Id. § 7703. Jurisdiction over such an appeal ordinarily lies with the Court of Appeals for the Federal Circuit. Id. § 7703(b)(1); see also Williams v. Rice, 983 F.2d 177, 180 (10th Cir. 1993). An exception is provided, however, for "[c]ases of discrimination subject to the provisions of section 7702," including claims of discrimination prohibited by section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16. Id. §§ 7702(a), 7703(b)(2). Such claims may be exhausted at the administrative level *via* alternative administrative processes, including by presentation of the discrimination claim to the MSPB in tandem with a petition for review of the adverse employment action (a so-called "mixed case").[1] See id. § 7702; 5 C.F.R. § 1201.151; 29 C.F.R. §§ 1614.302 & 1614.310. Jurisdiction over an appeal taken from a final decision

---

[1] "Federal employees with Title VII claims that are not mixed with adverse actions within the MSPB's jurisdiction must file an initial complaint with their agency EEO to pursue their claims." Chappell v. Chao, 388 F.3d 1373, 1375 n.2 (11th Cir. 2004).

by the MSPB in a mixed case lies in the "appropriate United States District Court." 29 C.F.R. § 1614.310(b); Kelliher v. Veneman, 313 F.3d 1270, 1274 (11th Cir. 2002). A final decision from the MSPB on the discrimination component of the mixed case is considered to exhaust the employee's administrative remedies *vis-à-vis* his or her employment discrimination claim. Chappell v. Chao, 388 F.3d 1373, 1375 (11th Cir. 2004).

Because this case presents a mixed case relating to federal employment in Maine, this court has jurisdiction to decide the controversy. The standard of review that applies to the non-discrimination claim differs from the standard that applies to the discrimination claim. The non-discrimination claim is to be reviewed based on the administrative record and the MSPB's determination may be set aside only if it is found to be arbitrary or capricious, is unsupported by substantial evidence, reflects an abuse of discretion, or is otherwise obtained without procedures required by law. Id.; 5 U.S.C. § 7703(c). To determine whether such concerns pertain the court "must conduct 'a searching and careful review' of the facts to determine whether 'the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Chem. Mfrs. Ass'n v. U.S. Envtl. Prot. Agency, 870 F.2d 177, 199 (5th Cir. 1989) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)). With respect to the discrimination claim, however, the appellant is entitled to a "trial *de novo* by the reviewing court." Williams, 983 F.2d at 179-80 (citing 5 U.S.C. § 7703(c)). The "trial *de novo*" concept has been characterized as requiring "*de novo* consideration of all issues of fact underlying [the discrimination claim]," Young v. West, No. 97-2066, 1998 U.S. App. LEXIS 12729, *2, 1998 WL 340388, *1 (4th Cir. June 16, 1998) (unpub.

op.), so that the claimant is "treated exactly like other Title VII plaintiffs," id., LEXIS at *16, WL at *6.[2]  Such equal treatment extends to pretrial discovery, something that was not pursued in this case.[3]  Cf. Washington v. Garrett, 10 F.3d 1421, 1437-38 (9th Cir. 1993) (affirming district court's discovery orders); Leach v. Dep't of Treasury, Civ. A. No. 86-1942, 1987 U.S. Dist. LEXIS 1389, *3-*4, 1987 WL 7198, *2 (E. D. Pa. Feb. 25, 1987) (considering whether to dismiss the plaintiff's case for failure to prosecute where the plaintiff did not conduct any pretrial discovery and failed to file a pretrial memorandum).

## FACTS

In support of its "motion for judgment on the record," the VA has utilized the process outlined in Local Rule 56 for developing a summary judgment record without distinguishing between Sher's discrimination and non-discrimination claims.  In opposition, Sher has similarly followed summary judgment praxis, denying and qualifying certain of the VA's factual assertions and also presenting additional factual statements in support of his petition for review.  Both parties cite the administrative record in support of their statements with the exception of certain statements that Sher seeks to support by citation to his supplemental affidavit and a VA training videotape discovered by Sher after the completion of the administrative process.  In a related Memorandum of Decision on Sher's motion to amend the record (Docket No. 16) and the

---

[2]      See also Chandler v. Roudebush, 425 U.S. 840, 863 (1976) (rejecting the contention that federal employees do not have the same right to a trial de novo as private-sector employees under Title VII and observing:  "The Congress was aware of the fact that federal employees would have the benefit of 'appropriate procedures for an impartial [agency] adjudication of the complain[t],' and yet chose to give employees who had been through those procedures the right to file a de novo 'civil action' equivalent to that enjoyed by private-sector employees").

[3]      In my initial Scheduling Order, I assigned this case to the "administrative track," which effectively prohibited discovery without advance judicial approval.  (Jan. 20, 2005, Scheduling Order, Docket No. 6.)  The order afforded Sher 10 days in which to object to its provisions.  Sher never sought leave to conduct discovery in relation to his discrimination claims.

VA's motion to strike Sher's references to the videotape (Docket No. 22), I have concluded that the "newly discovered" videotape evidence is not properly before the court for purposes of its judicial review of the MSPB's administrative decision on Sher's non-discrimination claims.  As for his discrimination claims, I observe that Sher's memorandum in opposition to the VA's motion for judgment does not incorporate the videotape evidence into the presentation of Sher's *prima facie* case or into his discussion of whether the VA's non-discriminatory justifications for demoting him were pretexts for discrimination.  (See Pl.'s Opp'n Mem. § IV at 14-20.)  Because the videotape evidence is thus targeted exclusively at the question of whether the VA's charges, the adverse action it took against Sher and that MSPB's decision to sustain those measures were arbitrary and capricious, an abuse of discretion or were unsupported by substantial evidence, I have not incorporated that evidence in my discussion.  Those questions must first be considered by the MSPB in a petition for review of its initial decision, as explained in the companion Memorandum of Decision on Sher's motion to supplement the record.

Plaintiff Alam Sher's nation of origin is Pakistan and he is a practitioner of the Muslim faith.  (Def.'s Statement of Material Facts ¶¶ 1-2, Docket No. 10.)  After an interview, John Sims, the Director of the VA's Togus Medical Center, hired Sher to serve at Togus in the position of Chief Pharmacist.  (Id. ¶ 3.)  The VA describes Sher's qualifications as follows:

> Sher possesses a doctor of pharmacy degree from Creighton University in Omaha, Nebraska.  (Id.)  He is licensed by the State of Pennsylvania.  He does not have a license or registration from the federal Drug Enforcement Administration to dispense controlled substances.  (Id.)  He has limited authority to prescribe medicine within the VA facility.  He is not authorized to prescribe narcotics.  (Id.)

Sher started working at Togus on January 2, 1999.  (Id. ¶ 6.)  There are at least three other Pakistanis (two pharmacists and a neurologist) and two other Muslims on the staff at Togus (including a radiologist).  (Id. ¶ 7; Admin. Record (AR) at 321-22.)  In the years that Sher has worked at Togus, he has received high evaluations.  (Id. ¶ 8.)

Federal regulations generally applicable to all federal agencies provide that public service is a public trust, that federal employees shall not use their public office for private gain, and that, with the exception of, among other things, modest items such as food, refreshment and gifts having less than a $20 value, federal employees shall not accept anything of monetary value from anyone doing business with the employee's agency. (Id. ¶ 10, citing 5 C.F.R. §§ 2635.101, .201-204.)  Local facilities and units of the VA, such as the Pharmacy of the Togus Medical Center, develop their own local policies, some of which are extensions or elaborations of government-wide rules or agency-wide rules, regulations and policies.  (Id. ¶ 11.)

"Sampling" is a practice in which representatives of, or salesmen working for, pharmaceutical companies give providers free samples of their medicines in order, among other things, to better understand the medicines' application and efficacy.  (Id. ¶ 14.)  In June of 2000, Sher experienced chest pain and consulted a cardiologist who suggested that Sher take a statin drug like Lipitor.  (Id. ¶ 15.)  On about June 16, 2000, in order to participate in a Parke-Davis promotional program, Sher signed a Free Goods Requisition Form for Lipitor.  (Id. ¶ 17.)  On about August 16, 2000, Sher signed another Free Goods Requisition Form for Lipitor.  (Id. ¶ 18.)

On August 6, 1999, Director Sims signed an updated version of a local policy entitled "Pharmaceutical Exhibits and Detail Procedures."  Its purpose was "[t]o establish

policies and procedures governing pharmaceutical exhibits and activities of representatives of various pharmaceutical firms within the Medical Center." It provided that "[d]ue to federal regulations regarding drug diversion, SAMPLING IS NOT PERMITTED within the Medical Center." (Id. ¶ 12.) It is undisputed that Sher was informed of this policy. (Id. ¶ 13, citing AR at 298-305.) According to Sher, he interpreted the policy as prohibiting only the distribution of samples to patients or veterans. (AR at 298.) As is recounted below, that was the understanding many medical professionals (providers) at Togus had of the Center's policy regarding sampling.

In August of 2000, Sher attended training on standards of ethical conduct for government employees that included training on the ethical prohibition against accepting gifts from persons doing business with the agency. (Def.'s Statement ¶ 20.) At that training, attendees were provided with a pamphlet entitled "An Ethics Pamphlet for Executive Branch Employees." It described and explained some of the ethical principles that applied to them. (Id. ¶ 21.) Those principles included the principles that "[p]ublic service is a public trust"; that "[a]n employee shall not, except as permitted by the Standards of Ethical Conduct, solicit or accept any gift or other item of monetary value from any person . . . doing business with . . . the employee's agency"; and that "[e]mployees shall not use public office for private gain." (Id. ¶ 22.) The pamphlet explained the rule against gifts from outside sources. Among other things, it explained that "you may not accept a gift from anyone who is giving the gift to you because of your Government position," that "you may not accept a gift from people or organizations who are 'prohibited sources' – those who do business with, or seek to do business with your agency." (Id. ¶ 23.) The pamphlet explained that the $20 exception to the general ban on

gifts "may be used to accept any gift that is not worth more than $20 . . . but not to ask for, something worth $20 or less," and that "there is a $50 per year limit on gifts from the same source." (Id. ¶ 24.)

In December of 2000, Sher asked a Pfizer sales representative for samples of Lipitor. (Id. ¶ 26.) In about mid-January of 2001, after a "lunch and learn" program, Sher met the sales representative and asked him for more samples of Lipitor. (Id. ¶ 27.) On about January 25, 2001, Sher asked another Pfizer representative for samples of Lipitor. Sher signed a "starter activity form" in order to receive the Lipitor. (Id. ¶ 28.) On about January 27, 2001, a Pfizer sales representative provided Sher with 32 10-milligram samples of Lipitor, which amounted to a 56-day supply. (Id. ¶ 29.) On about January 29, 2001, another sales representative provided Sher with additional Lipitor samples. (Id. ¶ 30.) On January 29, 2001, a Togus employee informed Mr. Schillinger and Togus counsel Carole Moore that Sher had accepted gifts of a large amount of prescription drugs from a pharmaceutical representative. (Id. ¶ 31.) On January 29, 2001, at Mr. Schillinger and Ms. Moore's request, Togus security officers stopped Sher as he was leaving Togus and found in his briefcase and in his office 672 10-milligram tablet samples of Lipitor. (Id. ¶ 32.)

Following an initial investigation, some aspects of which are discussed in additional detail below, Togus Chief of Staff Timothy Richardson charged Sher with 9 "violations." (Id. ¶ 50.) Following the completion of the entire investigation, Director Sims sustained the following 5 charges, identified by the number assigned in the charging instrument:

(1a.)    Misrepresenting himself as a practitioner on free goods requisition forms for Lipitor dated June 16, 2000 and August 16, 2000, in violation of

5 C.F.R. § 2635[.101 *et seq.*], Standards of Ethical Conduct for Employees
of the Executive Branch;[4]

(1b.)   Soliciting samples of Lipitor from a pharmaceutical representative
in December 2000, in violation of 5 C.F.R. § 2635;

(1c.)   Soliciting samples of Lipitor from a pharmaceutical representative
on January 25, 2001, in violation of 5 C.F.R. § 2635;

* * *

(1e.)   Receiving and possessing 672 tablet samples of Lipitor on
January 29, 2001, in violation of 5 C.F.R. § 2635;

***
(1i.)   Refusing to provide information to an investigator in connection
with an administrative investigation, in violation of 38 U.S.C. § 0.735-12.

(Id. ¶¶ 50, 55.)  As punishment for the violations Sims imposed a 45-day suspension and

demoted Sher from his chief pharmacist position with a corresponding reduction in his

pay grade from GS-13 to GS-12.  (Id. ¶¶ 55, 60; Pl.'s Opposing Statement and Statement

of Add'l Facts ("Pl.'s Statement") ¶ 81, Docket No. 29.)

The charge of refusing to provide information to an investigator concerns federal

regulations of general application that require federal employees to furnish information

with respect to employment and disciplinary matters unless doing so would be self-

incriminating.  Refusal to do so may be grounds for discipline.  (Def.'s Statement ¶ 36,

citing 38 C.F.R. § 0.735-12.)  On about February 1, 2001, VA Investigator Timothy Bond

interviewed Sher and Sher admitted receiving free samples of Lipitor from Pfizer sales

representatives.  (Id. ¶ 37.)  By this time, Sher had contacted attorney Sumner Lipman to

represent him in the matter.  (Id. ¶ 38.)  VA Investigator Bond presented the case against

Dr. Sher to the United States Attorney's Office for the District of Maine for consideration

for criminal prosecution, and on March 7, 2001, the U.S. Attorney's Office declined

---

[4]      This charge was sustained only in part.  (AR at 392.)

criminal prosecution. [5]  (Id. ¶ 40.)  By letter dated June 28, 2001, Togus Chief of Staff Richardson informed Sher that the U.S. Attorney's Office had declined criminal prosecution, that the issue was now an administrative matter, that Sher was obliged by regulation to cooperate and provide information, that he could be disciplined if he refused, and that Sher should appear for an interview on July 10, 2001.  (Id. ¶ 41.) Richardson's letter also informed Sher that he was "entitled to a representative of [his] choice." (Pl.'s Statement ¶ 83.)  By letter dated July 2, 2001, Sher asked to reschedule the interview because he was scheduled to be on vacation until July 11, 2001, and his attorney Sumner Lipman was unavailable until July 15, 2001.  (Def.'s Statement ¶ 42.)  A Mr. Schillinger, acting on behalf of Director Sims, rescheduled the interview for July 11, 2001, thereby effectively refusing Sher's request to have his preferred representative present.  (Id. ¶ 43; Pl.'s Statement ¶ 77.)  In his memo to Dr. Sher dated July 2, 2001, Mr. Schillinger reiterated that the U.S. Attorney's Office had declined criminal prosecution, that the issue was now an administrative matter, that Sher was obliged by regulation to cooperate and provide information, and that he could be disciplined if he refused. (Def.'s Statement ¶ 43.)  On July 11, 2001, Sher appeared with attorney Keith Varner for an interview with Investigator Bond.  (Id. ¶ 44.)  Agency Counsel Moore attended the meeting.  She reiterated that the U.S. Attorney's Office had declined criminal prosecution, and reminded Sher and his attorney Keith Varner (Mr. Lipman's partner) that as a VA employee, Sher was obliged to cooperate with internal investigations and

---

[5]     The record does not establish what basis in fact existed for any criminal prosecution. Conceivably, the investigation might have uncovered evidence capable of supporting a prosecution under 18 U.S.C. § 201(b)(2) (prohibiting public officials from seeking or accepting anything of value in return for being influenced in the performance of an official act). However, the VA never charged Sher with being influenced in the performance of his official acts in connection with his solicitation of Lipitor.  (Def.'s Statement ¶ 50.)

was subject to disciplinary action for refusing to do so.  (Id. ¶ 45.)  Varner asked that the interview be rescheduled to July 13, 2001, to make it possible for Mr. Lipman to attend. Moore declined the request.  (Pl.'s Statement ¶ 85.)  Mr. Varner also objected to the interview on the grounds that it exposed Sher to criminal liability.  (Id. ¶ 46.)  In an effort to alleviate Sher and his counsel's concerns, VA counsel Moore offered to and did obtain a letter from the U.S. Attorney's Office for the District of Maine concerning the Office's declination.  (Id. ¶ 47.)  On July 11, First Assistant United States Attorney William H. Browder, Jr., authored a letter to Attorney Varner that stated:

> This is to confirm that on March 7, 2001, this office declined criminal prosecution of Sher in favor of administrative action.  The conduct for which Sher was being considered for prosecution was his request and receipt of drug samples (specifically Lipitor) in August of 2000 and in January and February of 2001.

(Id. ¶ 48.)  After Mr. Varner had a chance to confer by phone with Attorney Lipman, Sher still declined to submit to the interview based upon Mr. Lipman's concern that the U.S. Attorney's declination still left Sher exposed to some risk of criminal prosecution. (Id. ¶ 49.)  By letter dated September 12, 2001, Sher responded to the VA's charges. Among other things, Sher admitted soliciting sample drugs, and admitted that the Lipitor samples found in his possession were obtained from pharmaceutical company sales representatives.  (Id. ¶ 54.)

        The record reflects that Sher was the only person investigated, charged and disciplined for soliciting and receiving samples.  What this means, of course, is that non-Pakistani/non-Muslim providers were not investigated, charged or disciplined with regard to soliciting or receiving samples.[6]  (Pl.'s Statement ¶ 80.)  It is uncontested that Sims knew of Sher's national origin.  (Def.'s Statement ¶ 4.)  There is an evidentiary dispute as

---

[6]        It also means that the other Pakistani and Muslim providers were not investigated.

to whether Sims knew of Sher's religious faith at the time the investigation was conducted and the disciplinary measures were imposed. If the court were to look exclusively at the portions of the administrative record cited by Sher, it would be forced to conclude that Sher fails to generate a genuine issue of material fact as to whether Sims had knowledge concerning Sher's religious faith.[7] (Pl.'s Statement ¶¶ 5, 86.) Sher asserts that Chief of Staff Richardson, who charged Sims and influenced Sims in regard to his decision, "was admittedly aware of Dr. Sher's Muslim faith." (Id. ¶ 86.) However, the cited portion of the record (AR at 146-148, transcribing Sims's testimony) does not support the statement that Richardson had knowledge of Sher's religion or that Richardson communicated that information to Sims. Nevertheless, Sher has now submitted a trial affidavit in which he asserts, evidently for the first time, that he told Sims in 1999 that he was a Muslim and asked Sims for space at the Medical Center to conduct Friday prayers. (Id. ¶ 5, citing Supp. Aff. of Alam Sher, Docket No. 29, Elec. Attach. # 2.) Thus, for purposes of Sher's trial de novo of his discrimination claims, the Court should resolve the dispute in Sher's favor.

Sher also states that he "presented overwhelming and credible evidence that other Chiefs of Service, including Chiefs of Pharmacy, committed the 'same offense.'" (Id. ¶ 89.) This statement is conclusory in nature. A review of those portions of the record he cites reflects that it was the case that doctors and pharmacists sometimes received samples for their personal use or the use of other VA personnel, that the witnesses did not consider that there was any need to hide the practice, that there was an interpretation of the sampling policy as prohibiting only distribution of samples to patients and that some

---

[7] Indeed, the ALJ found that the record lacked evidence to support a finding that Sims knew that Sher was a Muslim. (AR at 672.)

witnesses regarded Sher's punishment as their first notice that the practice is against Togus policy.[8]  (See also id. ¶¶ 92-93.)  Sher also fails to generate a genuine issue whether Sims was aware of any other offenses.  Indeed, in answering questions about the existence of other Pakistani or Muslim providers at Togus, Sher testified that staff pharmacists and the other providers mentioned would not have any contact with Sims. (AR at 321-322.)  Instead of presenting any evidence of Sims's knowledge of sampling, Sher seeks to have the court infer that Sims knew or should have known of other instances of sampling at Togus.  According to Sher, nearly a year prior to being charged he informed Chief of Staff Richardson that there was a cupboard full of samples in the VA's Caribou medical center.  Sher testified that he brought the samples to Richardson's attention because of the concern that—given the quantity and location of the sample pharmaceuticals—they would find their way into patient hands.  According to Sher, Richardson did not express any surprise at the presence of the samples.  (Id. ¶ 94.)  Sher also testified that he perceived Sims's "attitude, demeanor and conduct" toward him to be hostile.  (Id. ¶ 96.)

### ADMINISTRATIVE FINDINGS

On review, the ALJ and the MSPB both sustained Sims's findings that Sher had committed the violations set forth in charges 1a, 1b, 1c and 1e.  (MSPB Opinion and Order, AR at 783-784; ALJ Initial Decision, AR at 651, 653-657.)  In its Opinion and Order, the MSPB observed that "[t]he appellant has not challenged the administrative

---

[8]      One witness testified that he was told by pharmaceutical representatives that previous chiefs of pharmacy had taken samples.  That statement is hearsay and, although admissible for purposes of the administrative hearing, it is not of evidentiary quality for purposes of Sher's trial de novo of his discrimination claims.  In any event, as discussed above, there is no evidence that Sims had knowledge of such sampling by prior chiefs of pharmacy, assuming any sampling occurred.

judge's determination to sustain [the charges relating to soliciting and accepting Lipitor] and . . . we see no reason to disturb the administrative judge's findings." (AR at 784.)

As for charge 1i (refusing to provide information to an investigator during an administrative investigation), the ALJ did not sustain it based on his findings and legal analysis (AR at 657-671), but on review the MSPB did sustain the charge based on its rejection of the ALJ's legal analysis (AR at 785-789). The ALJ and the MSPB also came to differing conclusions about the penalty imposed by Sims. The ALJ declined to sustain Sher's demotion and found that no penalty was called for under the circumstances, based on specific findings that it was the general understanding at Togus that its "Pharmaceutical Exhibits and Detail Procedures" policy prohibited only the distribution of samples to patients and veterans, that Sher's understanding of the policy was consistent with the general understanding, and that it was the general practice and culture at Togus that its providers sought and accepted samples for personal and family use. (AR at 674-689.) The MSPB overturned the ALJ's reversal of the demotion on the following grounds:

1.  Violations of the gift ban regulation were clearly made out;

2.  Sher attended a training session in August 2000 and received a pamphlet explaining the gift ban;

3.  The plain language of the gift ban, as described in the pamphlet, put Sher on notice that he could not solicit items of monetary value, which the samples plainly were;

4.  Although it may have been common for providers to accept samples for personal use, there was testimony that receipt of a 6-month supply went well beyond the norm;

5.  It was reasonable for Sims to hold Sher to a higher standard because Sher was a supervisor;

6.      The penalty given was within the VA's table of penalties for a first-
        time violation of the gift ban;[9] and

7.      Sher failed to participate in the VA's investigation after the U.S.
        Attorney's Office had declined criminal prosecution, which could
        also independently justify a penalty as severe as removal.[10]

(AR at 792-94.)

## DISCUSSION

In his memorandum of law, Sher begins with an argument that "the charges

against Dr. Sher . . . cannot and must not be sustained" (Pl.'s Opp'n Mem. at 8) based on a

newly discovered "crucial piece of evidence that supports Dr. Sher's testimony that

solicitation of drug samples from salesmen was acceptable under the policies actually in

place at Togus VA."  (Pl.'s Opp'n Mem. at 5-6.)[11]  Because this argument is premised on

newly discovered evidence, which I have excluded from the administrative record, I do

not address it herein.  (See Mem. Dec. on Pl.'s Mot. to Amend Record and Def.'s Mot. to

Strike.)  Sher's second contention is that the MSPB incorrectly sustained the charge that

he refused to provide information in an administrative investigation.  (Pl.'s Opp'n Mem.

at 8-14.)  Sher presents his discrimination claim last.  (Id. at 15-20.)  Like Sher, I address

the questions related to his petition for review before turning to the question of whether

Sher has generated a genuine issue of material fact in support of his discrimination claim.

---

[9]      Sher admits this fact.  (Pl.'s Statement ¶ 52.)
[10]      The MSPB and the ALJ agreed that Sher failed to prove his assertion that he was selectively
charged or singled out for punishment based on his national origin or religious belief.  (Def.'s Statement ¶¶
66, 69.)
[11]      I observe that the MSPB, in its opinion and order sustaining the VA's findings and disciplinary
action, indicated at the outset that "[t]he appellant [Sher] has not challenged the administrative judge's
determination to sustain [the charges relating to soliciting and accepting Lipitor] and, after reviewing the
record, we see no reason to disturb the administrative judge's findings."  (AR at 784 ¶ 5.)  I am, hence,
concerned that this aspect of Sher's petition for judicial review should not been preserved.  This concern
reinforces my conclusion that Sher's request for the court to consider his newly discovered evidence should
be denied until such time as it has been presented to the MSPB through a petition to reconsider its initial
decision, pursuant to 5 C.F.R. § 1201.115(d)(1).

**A.      Judicial Review of the Administrative Action**

The scope of judicial review of decisions of the MSPB is circumscribed by statute.  In order to overturn the MSPB's disposition of his administrative appeal, Sher must demonstrate that the disposition was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;  . . . obtained without procedures required by law, rule, or regulation having been followed; or . . . unsupported by substantial evidence."  5 U.S.C. § 7703(c).  Sher contends that the MSPB's decision must be overturned by the court because, as the administrative law judge found, he did not refuse to participate in the VA's investigation.  (Pl.'s Opp. Mem. at 8-14.)  But his first attack on the decision is that it must be overturned because the VA's failure to produce the training videotape was a "discovery violation and resulted in a fraud upon the board and this court."  (Id. at 5.)  Notably, Sher does not contend that there was no substantial evidence in support of the conclusion that he had violated the gift ban regulation.  In fact, the MSPB asserted that Sher did not appeal the ALJ's decision to sustain the charges related to the gift ban violations.

**1.      *Non-production of the videotape during the administrative process generates an issue that is not properly before this court at this juncture.***

According to Sher, the VA's failure to produce the videotape in connection with his disciplinary proceeding violated the ALJ's acknowledgement order, which required the VA to tab and file in the administrative record "[c]opies of all other documents which are relevant and material to this appeal."  (Pl.'s Opp. Mem. at 6.)  Sher further asserts:

> The failure of the [VA] to produce the training videotape . . . gravely disadvantaged Dr. Sher at his hearing before the administrative law judge. In particular, the absence of the training videotape prevented counsel for Dr. Sher from cross-examining the [VA's] witnesses about the policies at [the] Togus [Medical Center] regarding drug sample solicitation.

(Id. at 7.)  Sher does not cite any precedent supportive of the proposition that a "discovery" violation of this ilk requires a reversal of the MSPB's determination.  As set forth in my Memorandum of Decision on Sher's motion to amend the record and the VA's motion to strike, my independent research reflects that Sher must raise this issue with the MSPB in the first instance, in a "petition for review of initial decision."  See 5 C.F.R. § 1201.115(d)(1); see also Wright v. U.S. Postal Serv., 183 F.3d 1328, 1332 (Fed. Cir. 1999) (discussing the MSPB's discretion to reopen a matter for further consideration in light of newly discovered evidence); Lugo v. MSPB, 128 Fed. Appx. 145, 146 (Fed. Cir. 2005) (unpublished opinion) (describing standard of judicial review that applies to a MSPB decision not to reopen such a matter).  Because the significance of the allegedly "newly discovered evidence" is a matter for the MSPB to consider in the first instance in the context of a petition for review of its initial decision in this matter, I conclude that the court should neither "reverse" nor "remand" the MSPB's determination in the context of the instant petition for judicial review.

> **2.**     ***The MSPB's decision to sustain the VA's decision to discipline Sher for refusal to participate in the VA's investigation is supported by substantial evidence and by the law.***
>
>     The Fifth Amendment privilege against self-incrimination may be asserted in an administrative investigation to protect against any disclosure an individual reasonably believes could be used in his own criminal prosecution or could lead to other evidence that might be so used. Kastigar v. United States, 406 U.S. 441, 444-45 (1972).  In addition, the threat of removal from one's position constitutes coercion, which renders any statements elicited thereby inadmissible in criminal proceedings against the party so coerced.  Garrity v. New Jersey, 385 U.S. 493, 497, 500 (1967) ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent.").  Nevertheless, because an employee receives "use immunity" through the so-called Garrity exclusion rule, he may be removed for failure to cooperate with an agency investigation.  Gardner v.

Broderick, 392 U.S. 273, 276 (1968).  Invocation of the Garrity rule for compelling answers to pertinent questions about the performance of an employee's duties is adequately accomplished when that employee is duly advised of his options to answer under any immunity actually granted or remain silent and face dismissal.  Weston v. Dep't of Hous. & Urban Dev., 724 F.2d 943, 948 (Fed. Cir. 1983).

Modrowski v. Dep't of Veterans Affairs, 252 F.3d 1344, 1350-51 (Fed. Cir. 2001).

According to Sher, the MSPB's affirmation of  charge 1i (refusing to provide information to an investigator in connection with an administrative investigation, in violation of 38 U.S.C. § 0.735-12) must be reversed because the MSPB's decision "was not supported by substantial evidence and was not in accordance with the law as set forth in *Modrowski*." (Pl.'s Opp'n Mem. at 14.)  Sher argues that it was inappropriate for the VA to punish him for failing to participate in the interview scheduled for July 11, 2000, because the letter obtained from the US Attorney's Office was ambiguous and "did not foreclose the possibility that Dr. Sher could be prosecuted at a point in the future." (Id. at 9.)  Sher contends that he was entitled to a specific grant of immunity before he could be expected to participate in the investigation and that he was also entitled to have the interview scheduled for a time when his preferred counsel could be present.  (Id. at 12-13.)  Sher also points to inaccuracies in the letter from the US Attorney, noting that "the letter set forth erroneous dates on which Dr. Sher's solicitation of Lipitor occurred." (Id. at 10.)  Sher also argues that he was concerned by the fact that Investigator Bond was conducting the interview because he understood Bond to be a criminal investigator.  (Id. at 10.)  The VA argues that once Sher was informed by the First Assistant United States Attorney of that office's declination of prosecution and that the drug solicitation matter was entirely administrative in character, "Dr. Sher could be removed for refusing to provide information." (Def.'s Mot. for J. at 9, Docket No. 9.)  The VA also argues that

18

Mr. Lipman's non-availability on the date scheduled for the interview did not require the VA to reschedule the interview or justify Sher's non-participation.  (Def.'s Reply Mem. at 4, Docket No. 33.)

In Sher's assessment, his case is like Modrowski, in which the Court of Appeals for the Federal Circuit reversed a finding by the MSPB that the petitioner therein failed to cooperate in a VA investigation.  252 F.3d at 1350-53.  The petitioner in that case contended that he was denied an "opportunity to be 'duly advised' of his options to respond to . . . questions under the immunity allegedly granted or face dismissal."  Id. at 1351.  The petitioner had received a letter from the VA investigator stating that the US Attorney had declined prosecution and he was ultimately charged and disciplined for failing to participate because he refused to answer questions on two occasions prior to his very first appointment to meet with counsel, scheduled to occur within a week of his receipt of the letter.  Id.  The Court of Appeals concluded that the circumstances made it reasonable for the petitioner to refuse to answer questions prior to meeting with his counsel for the following reasons:

1.  The letter reporting the US Attorney's declination of prosecution came from the agency, not from the US Attorney's Office;

2.  The letter reported a declination to prosecute the petitioner, but did not set forth "an express grant of immunity;"

3.  The scope of the declination was ambiguous because it covered only two specific real estate transactions and made no mention of theft charges that were the focus of the VA's initial investigation;

4.  The agency had not yet stated that it had discontinued its criminal investigation.

Id.  In summation, "[t]he terse language of the letter suggests to us that Modrowski had a reasonable apprehension that any of his responses to [the investigator] made under the

supposed grant of immunity with respect to the sale of the houses could nevertheless be used against him in any eventual criminal proceedings concerning theft from, or vandalism to, the houses."  Id. at 1351-52.  Based on the circumstances, the Court of Appeals found that the decision to deny Modrowski a weeks time to consult an attorney prior to participating in the VA's investigation was arbitrary and capricious.  Id. at 1352.

The VA argues that Sher's case is less like Modrowski and more like Weston v. Department of Housing and Urban Development, 724 F.2d 943 (Fed. Cir. 1983), in which the Court of Appeals for the Federal Circuit affirmed a decision of the MSPB sustaining disciplinary measure imposed against a federal employee for failing to participate in an investigation.  In Weston, the petitioner and her counsel met with the agency's inspector general and received a copy of a notice that informed the petitioner that the U.S. Attorney declined criminal prosecution in regard to the topic of the interview and that the matter had become "purely an administrative inquiry."  Id. at 946.  The notice further stated: "Any information or evidence you furnish in response to questions propounded to you during this interview, or any information or evidence which is gained by reason of your answer, may not be used against you in criminal proceedings; however, it may be used against you administratively."  Id.  Based on the advice of her counsel, the petitioner refused to participate in an interview and was removed from her position with the agency. Id. at 946-47.  At the first stage of administrative review and on further review by the MSPB, the charge of refusing to participate in the administrative investigation was sustained.  Id. at 947.  On further review by the Court of Appeals, the MSPB decision was affirmed.  The Court reasoned:

> The record clearly discloses that at the meeting of February 25, 1981, Ms. Weston and her counsel were in effect advised of the invocation of the

> *Garrity* rule by the statement distributed and read by Mr. O'Hara. Thus, there is no question that Ms. Weston's refusal then and subsequently to participate in the proposed investigation was not justifiable out of any valid fifth amendment considerations, and the charge of refusing to cooperate during an official HUD inquiry was correctly sustained by the MSPB.

Id. at 948.

Sher's case, of course, is distinguishable from both Modrowski and Weston in important regards.  Unlike the petitioner in Modrowski, Sher was counseled prior to his refusal to participate in the interview.  Indeed, Sher's counsel appear to have focused much of their energy on the question of what kind of warning or promise Sher should demand in consideration for his participation.  Also unlike Modrowski, Sher actually received a written declination of prosecution from the U.S. Attorney which indicated that the matter of his Lipitor solicitations would not be the subject of a criminal prosecution.  Finally, the VA itself repeatedly informed Sher that it had discontinued its criminal investigation, unlike the agency in Modrowski.  As for the Weston precedent, Sher's circumstance differs in only one significant regard:  the Garrity notice he was given did not specifically state that any responses he might give to questioning could not be used against him in any future prosecution.

I conclude that, on balance, it was not an abuse of discretion for the VA to punish Sher for his refusal to participate in the interview scheduled for July 11, 2001, because: (1) Togus Chief of Staff Richardson told Sher more than a week before the interview that the U.S. Attorney had declined prosecution, that the issue was thus entirely administrative in nature, that Sher was obliged by regulation to cooperate and provide information and that he could be disciplined if he refused; (2) Togus Director Sims, through an assistant, reiterated the fact that prosecution had been declined and that Sher

could be disciplined for failing to participate in the investigation, also days before the interview; (3) at the commencement of the interview, the VA's counsel reiterated a third time that prosecution had been declined and that he could be disciplined for not cooperating in the investigation; (4) Sher was accompanied to the interview by counsel and also received advice during the meeting from Mr. Lipman by telephone; and (5) reassurance was obtained during the meeting from the U.S. Attorney's Office, *in writing*, that it had declined prosecution in favor of administrative action.  In my assessment, the fact that Sher not only was represented and advised by counsel with regard to the question of whether to participate but also was expressly advised in writing by the U.S. Attorney that there would be no prosecution triggered Sher's regulatory obligation to participate in the VA's investigation.  Indeed, I find Sher's plaint about being denied counsel of his choice to be unsubstantiated.  The record reflects that on the date of his interview Sher *was* counseled by Mr. Lipman on the question of whether to participate in the VA's investigation.  What additional service Mr. Lipman would have afforded during the interview that Mr. Varner could not also have provided—assuming Sher had participated in the interview—is difficult to understand and is nowhere suggested by Sher in his papers.  As for Sher's insistence that he receive a Garrity notice with the magic word "immunity" in it, my impression is that the U.S. Attorney's express declination of prosecution actually afforded Sher greater protection than was called for under the Fifth Amendment.  Under the Fifth Amendment, Sher was entitled only to "use immunity" for statements provided under the compulsion of disciplinary sanctions.  Kastigar v. United States, 406 U.S. 441, 453 (1972); Gardner v. Broderick, 392 U.S. 273, 276-77 (1968). Here the prosecuting authority effectively promised transactional immunity in exchange

for Sher's participation.  "Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege."  Kastigar, 406 U.S at 453.  Indeed, regardless of whether Sher was expressly educated about "use immunity," it is difficult to imagine that Sher would not receive, in the context of any future prosecution, full use immunity from statements he had made under the threat of possible discharge from employment and in response to assurances from both the complaining agency and the prosecuting authority that a criminal prosecution would not be pursued.  See Garrity, 285 U.S. at 500 (holding that statements made by a police officer under threat of discharge from office could not be used against him in a future prosecution where he had not signed a waiver of immunity); Gardner, 392 U.S. at 278 ("If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, *without being required to waive his immunity* with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, . . . the privilege against self-incrimination would not have been a bar to his dismissal.") (citing Garrity) (emphasis added and footnote omitted); see also D'Acquisto v. Washington, 640 F. Supp. 594, 604, 623 (N. D. Ill. 1986) (involving § 1983 action by police officers challenging department policy of immediately suspending officers who do not cooperate with internal investigations after they are told that the department has no intention of seeking prosecution, but in the absence of assurances that the prosecuting authority has declined prosecution, and observing that prior department practice of suspending non-cooperating officers only after the prosecuting authority had declined prosecution in writing was more than the

Fifth Amendment required); cf. McKinley v. City of Mansfield, 404 F.3d 418, 439 n.24 (6th Cir. 2005) ("To comport with Garrity, a state employer who compels an employee to make incriminating statements must not only promise not to use those statements in a criminal proceeding against the employee, but must also *keep* that promise.") (addressing employee's § 1983 claim against police officers who allegedly violated his Fifth Amendment rights by wrongfully coercing or inducing statements by means of false Garrity assurances); In re Kelly, 350 F. Supp. 1198, 1200 & n.2 (E. D. Ark. 1972) ("Upon a finding by the court that [a promise of immunity] has been made by the U.S. Attorney, the witness is in no danger of prosecution as a result of his compelled testimony and he has in effect been immunized.  This immunity derives from inherent prosecutorial discretion as exerci[s]ed daily.  No court could permit the U.S. Attorney or the Justice Department to renege on such a promise . . . without running afoul of Constitutional principles.").

In sum, whatever fear Sher and his counsel may have entertained that the U.S. Attorney might, in theory, prosecute Sher in the future for soliciting Lipitor or that Sher might be deemed to have waived his Fifth Amendment rights by answering questions was an unreasonable fear under the circumstances.  The prosecuting authority represented in writing that prosecution for violation of the gift ban by soliciting Lipitor was declined and that the matter was therefore administrative in nature.  This representation, coupled with the VA's repeated assurance that it was not seeking a criminal prosecution,[12] was more than sufficient to reassure Sher that his Fifth Amendment rights would not be

---

[12]    I consider Sher's stated concern about the First Assistant U.S. Attorney's failure to specifically mention Sher's December 2000 solicitation activity in the letter to be without substance.  In context, there is substantial evidence in support of the MSPB's finding that the VA and the prosecuting authority provided Sher with sufficient assurance that he would not be prosecuted for soliciting Lipitor during the relevant timeframe.

waived by participation in the investigation and, by extension, justified disciplinary action for his non-participation.  I therefore recommend that the court affirm the MSPB's decision to sustain the VA's finding on the refusal to participate charge because it was supported by the evidence and was neither arbitrary nor capricious. [13]

## B.   National Origin and Religious Discrimination ("Trial *de novo*")

Sher's claim of discrimination must be evaluated in accordance with the ordinary summary judgment standard.  Kelliher, 313 F.3d at 1274-1275.  "The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a

---

[13]      The MSPB's reasoning was as follows:

[T]he letter from the U.S. Attorney's Office was sufficient to provide [Sher] with use immunity from prosecution under the *Garrity* rule based on any statement that he made during any subsequent interview regarding the conduct for which [Sher] was being considered for prosecution.  Unlike the circumstances in *Modrowski*, there was no other activity that the agency was investigating.  Furthermore, in contrast to the facts in *Modrowski*, the assurance came from the U.S. Attorney and not merely from the agency.

More important, in contrast to the employee in *Modrowski*, who had never spoken to an attorney about the matter, the appellant had access to an attorney.  He had the services of his named representative Lipman since February 2000 [*sic*, read 2001].  On July 11, he had the advice of Varner, a licensed attorney, albeit not one experienced in criminal law.  Additionally, he had the advice of Lipman by telephone on July 11.  Considering these circumstances, we find that the appellant had no right to decline to be interviewed on July 11, and the agency correctly charged him with failing to provide information in an administrative investigation.  Accordingly, we sustain the charge.

(AR at 789.)

reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of
material fact, the Court must view the summary judgment facts in the light most
favorable to the nonmoving party and credit all favorable inferences that might
reasonably be drawn from the facts without resort to speculation.  Merchants Ins. Co. v.
United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences
could support a favorable verdict for the nonmoving party, then there is a trial-worthy
controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of
Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Because Sher has not presented any direct evidence of discriminatory animus his
discrimination claim must be evaluated according to the burden-shifting paradigm
described in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).
Accordingly, the first order of business is for the plaintiff to establish that he can meet the
elements of a *prima facie* case.  Should the plaintiff succeed in this endeavor, a
presumption of retaliation arises and the evidentiary burden shifts to the defendant to
articulate a legitimate, non-discriminatory reason for taking the adverse action against the
plaintiff.  Once a non-discriminatory rationale is put forward by the defendant, the
presumption of discrimination is dispelled and the burden returns to the plaintiff to
demonstrate that the defendant's stated rationale is a pretext for discrimination.  Id. at
802-804.

The VA contends that the MSPB's rejection of Sher's affirmative defense of
discrimination must be upheld because there was neither direct nor indirect evidence that
Chief of Staff Richardson or Director Sims harbored discriminatory animus toward Sher.

(Def.'s Mot. for J. at 5-6.)  In response, Sher begins by asserting that the MSPB erroneously found that Sims had no knowledge of Sher's religion.  (Pl.'s Opp'n Mem. at 15.)  Sher asserts in a supplemental affidavit that Sims knew of his religion because he informed Sims of it in 1999 when he asked Sims for space at the Medical Center for Friday prayers.[14]  (Pl.'s Statement ¶ 5, citing Supp'l Aff. of Alam Sher, Docket No. 29, Elec. Attach. #2.)  Based on this supplemental affidavit the court should find that a genuine issue exists whether Sims knew of Sher's religious faith for purposes of Sher's trial *de novo*.  However, Sher's supplemental affidavit obviously was not part of the administrative record before the ALJ or the MSPB and the testimony Sher cites from the administrative record does not establish that Sims had knowledge of Sher's religion.  There simply is no basis in the administrative record to fault the MSPB's finding on this issue.  My "*de novo*" McDonnell Douglas analysis follows.

"Generally, a plaintiff establishes a prima facie case by showing that (1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications."  Ugurhan Akturk Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003).  The VA does not challenge Sher's ability to satisfy this showing.  Accordingly, I turn to the VA's justification for charging and imposing adverse employment measures on Sher.  In its memorandum of law the VA asserts as its legitimate, non-discriminatory reason for disciplining Sher the fact that Sher violated "ethical rules governing executive branch employees."  (Mot. for J. at 6.)  The record supports this assertion.  Sher was discovered with 672 individual samples of Lipitor in his

---

[14]     Sher does not suggest that Sims denied the request for a space to conduct Muslim Friday prayers.

possession.[15]  Because the VA has put forward a legitimate, non-discriminatory rationale

for punishing Sher, the burden returns to Sher to demonstrate that the rationale offered by

the VA is a pretext for discrimination and that the totality of the circumstances presented

by the record would "enable a rational factfinder reasonably to infer that unlawful

discrimination was a determinative factor in the adverse employment action."

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 n.5 (1st Cir. 1999).  One of

the ways that pretext can be demonstrated is with evidence that the employer's stated

rationale was disparately applied.  Chungchi Che v. Mass. Bay Transp. Auth., 342 F.3d

31, 39 (1st Cir. 2003).  Sher seeks to build a case for discrimination on the fact that he

"presented overwhelming and credible evidence that other Chiefs of Service, including

Chiefs of Pharmacy, had committed the 'same offense' as Dr. Sher."  (Pl.'s Opp. Mem. at

17, 20.)  The record does support a finding that Sher was not the first provider at Togus to

engage in sampling for personal use.  However, Sher has not demonstrated that Director

Sims had knowledge of the personal sampling engaged in by other providers at Togus.

Nor does Sher demonstrate that any other providers engaged in the "same offense,"

insofar as Sher obtained a very substantial quantity of Lipitor, enough to cause another

Togus employee to report the matter to Mr. Schillinger and Ms. Moore.  Furthermore,

even if Sher could demonstrate that either Director Sims or Chief of Staff Richardson

were aware of a practice among providers of engaging in personal use sampling, the mere

fact that other providers at Togus engaged in personal use sampling does not expose as

pretextual the VA's explanation that Sher was charged based on the relatively egregious

nature of his sampling (or the appearance of an egregious violation based on the large

---

[15]     The other ethical violation charged by the VA concerns Sher's alleged failure to cooperate in its
investigation after the US Attorney's Office declined criminal prosecution.  Because that charge is disputed
by Sher, I address it in the context of the pretext discussion, below.

volume of pills he obtained).  Indeed, contrary to Sher's contention, his presentation before the ALJ did not demonstrate that any other provider had committed the "same offense" by volume or by value, much less that either the Chief of Staff or the Director had personal knowledge of such a violation by another, non-Pakistani or non-Muslim provider at the Togus Medical Center.[16]

In addition to the violation of the gift ban rule, there is the matter of the other "ethical rule" that Sher was found to have violated: the requirement that employees participate in disciplinary investigations when they can do so without incriminating themselves.  At pages 19-20 of his opposition brief, where Sher addresses the issue of pretext, he fails to challenge this additional basis for his demotion and reduction in pay. That is problematic because, even if there were a technical obstacle to this court entering a legal finding that Sher violated the rule, that would not necessarily establish that Director Sims's independent determination that the rule was violated was a pretext for discrimination.  In any event, my review of the administrative process reflects that the MSPB was correct in its determination that First Assistant United States Attorney William H. Browder's letter declining prosecution, coupled with the VA's repeated assurances that it was not seeking criminal prosecution, was more than adequate assurance that Sher's participation in the VA's investigation would not constitute a waiver

---

[16]     Sher points to testimony at the administrative hearing by certain Togus providers who acknowledged having either engaged in personal use sampling or knowing others who did so.  The problem with this "evidence" is that there is no evidence that it was known to Sims at the relevant timeframe when he was deciding the charges brought against Sher or what punishment to impose.  Neither party discusses the nature of the hearing that Sher had or might have had within the Togus Medical Center (i.e., before the appeal process).  All the court is told is that Sher did not participate in an investigation conducted on July 11, 2001, and subsequently admitted in a letter to the VA that he had solicited the Lipitor samples found in his possession.

of Sher's Fifth Amendment rights.[17]  Because there is no direct evidence in the record of

discriminatory animus and because Sher fails to generate a trialworthy issue on the

existence of animus in his pretext presentation, I conclude that summary judgment should

enter against Sher's discrimination claim.

### CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **GRANT** the VA's

motion for judgment.

### NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum, and
request for oral argument before the district judge, if any is sought, within
ten (10) days of being served with a copy thereof.  A responsive
memorandum and any request for oral argument before the district judge
shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  August 4, 2005

---

[17]     Also relevant to the pretext analysis is the employer's "general policy and practice with respect to
minority employment."  Id. at 804-805.  The record demonstrates that Sher's national origin was known to
Director Sims when Sher was hired to the chief of pharmacy position and that at least three other Pakistanis
are currently employed by the VA at the Togus Medical Center.